109 Cal.Rptr.2d 909 (2001)
91 Cal.App.4th 409
Matthew PAVLOVICH, Petitioner,
v.
The SUPERIOR COURT of Santa Clara County, Respondent; DVD Copy Control Association, Inc., Real Party in Interest.
No. H021961.
Court of Appeal, Sixth District.
August 7, 2001.
As Modified August 31, 2002.
Review Granted December 12, 2001.
*910 HS Law Group, San Jose, Allonn E. Levy, Attorneys for Petitioner.
Weil, Gotshal & Manges, Jared Ben Bobrow, Christopher J. Cox, Robert G. Sugarman, Jeffrey L. Kessler, Geoffrey D. *911 Berman, Menlo Park, Attorneys for Real Party in Interest.
No attorneys representing Respondent.
PREMO, Acting P.J.
Petitioner Matthew Pavlovich petitions for a writ of mandate to compel the trial court to quash service of process.
We deny the petition.

PROCEDURAL HISTORY
On December 27, 1999, real party in interest DVD Copy Control Association, Inc. (DVD CCA) filed a complaint in the superior court against petitioner and other defendants for misappropriation of trade secrets. The complaint alleged that petitioner had repeatedly republished DVD CCA's trade secrets and copyrighted material throughout the Internet.
On June 6, 2000, petitioner filed a motion to quash service of summons on the ground that the superior court lacked jurisdiction over his person. Petitioner was a student at Purdue University in Indiana at the time of the filing of the complaint, and now resides in Texas. In his motion to quash, petitioner claims to have no contacts with the State of California sufficient to warrant the exercise of jurisdiction by the State over his person.
On August 30, 2000, the superior court denied petitioner's motion to quash.
On September 11, 2000, petitioner filed with this court a petition for a writ of mandate to compel the trial court to quash the service of process.
On October 11, 2000, this court summarily denied petitioner's writ petition.
On October 23, 2000, petitioner filed with the California Supreme Court a petition for review.
On December 19, 2000, the California Supreme Court granted review, and transferred back the matter to this court "with directions to vacate its order denying mandate and to issue an order directing respondent superior court to show cause why the relief sought in the petition should not be granted."
On January 16, 2001, this court, pursuant to the Supreme Court order, vacated its order denying mandate and ordered the superior court to show cause why the relief sought in the petition should not be granted. On its own motion, this court issued a temporary stay order, which stayed trial court proceedings during the pendency of the petition.
On February 15, 2001, DVD CCA, as the real party in interest, filed its return in opposition to the petition for a writ of mandate.
On March 7, 2001, petitioner filed his reply to the return.

FACTS
Pavlovich is the president of a start-up technology company. He was, "[f]or the most part of ... four years," a computer engineering student at Purdue University, and had worked as a computer technician for Best Buy and Pingtek Corporation. The discovery materials on record indicate that Pavlovich and the other defendants developed and/or posted computer programs on the Internet, including a program called DeCSS, that misappropriate DVD CCA's trade secrets. Such computer programs have been designed to defeat DVD CCA's encryption-based copy protection system, known as the Content Scramble System, or CSS, which is employed to encrypt and protect the copyrighted motion pictures contained on digital versatile discs, or DVDs. At the time Pavlovich posted DeCSS on the Internet, he was a leader in the "open source" movement, the purpose of which was to make as much material as possible available over the Internet. Deposition materials further indicate that Pavlovich founded and operated *912 the LiVid video project, whose purpose was to aid in the development of an unlicensed system for DVD playback and copying. Pavlovich owned and operated the Web site called "livid.on.openprojects.net," where he posted the DeCSS program.
Pavlovich knew that DVDs deliver motion picture content to their purchasers. He testified in his deposition that DVDs are "a large storage medium" that can be used for "a lot of different things," one of which, "holding motion pictures," is "probably the most well known."
Pavlovich admitted in his deposition that "there was an organization which you had to file for or apply for a license or whatever" to use certain DVD technology, and that he knew about this because "[i]n the course of the development of the project, the Linux video and DVD project, there was a lot of discussion regarding the decryption piece of the full length of decoding of DVD and, you know, there were individuals making statements on the mailing list as toto that effect." Pressed for the kind of statements he had heard, Pavlovich answered it was "[s]omething along the lines of you've got to apply for a license and whatnot."
Nonetheless, Pavlovich never sought or obtained a license to use DVD technology for his LiVid project. Pavlovich admitted that his LiVid project utilized DVD CCA's trade secrets, including those contained in DeCSS. Pavlovich further admitted that through the LiVid project he aimed to develop an unlicensed DVD player that would use DeCSS to decrypt DVD data. Pavlovich knew that DeCSS was developed by reverse engineering, which he knew was unauthorized. Pavlovich stated in his deposition that he believed that "DeCSS was reverse engineered from another player like a Windows player." Asked if DeCSS was derived from CSS algorithms, Pavlovich responded: "Yes. They had to reverse engineer those algorithms in order to mimic them. Like just kind of quick once over, when you are reverse engineering something, you see what goes in and what comes out, and if you don't have access to that information, what one would do is try to mimic those, so they wouldn't necessarily be the exact algorithms, but if you can get as close or if you can get the correct results, then the engineeringreverse engineering process can be deemed a success."
Despite his knowledge of how DeCSS obtained and misappropriated DVD CCA's trade secrets, Pavlovich sought to and actually disseminated those trade secrets.
Pavlovich further admitted that it was common knowledge that the motion picture industry was centered in California, and that the computer technology industry has a dominant presence in California. Of the more than 400 companies nationwide that are licensed to make computer hardware and software which allow consumers to view digital images on DVDs (CSS licensees), 73 are located in California. Pavlovich knew that pirating DVDs is illegal, and that DeCSS facilitates pirating of DVDs.

DISCUSSION
The Internet is new technology that allows instant access to information published at a Web site jurisdictions away. The question in this case is whether California's long-arm statute reaches owners, publishers, and operators of those Web sites when, in violation of California law, they make available for copying or distribution trade secrets or copyrighted material of California companies. We hold it does.
The Internet, as a mode of communication and a system of information delivery *913 is new, but the rules governing the protection of property rights, and how that protection may be enforced under the new technology, need not be. There is, for instance, sufficient guidance provided by the United States Supreme Court in Colder v. Jones (1984) 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (Calder).
In Calder, the plaintiff Shirley Jones brought suit in California against the defendants South and Calder, claiming that she had been libeled in an article written and edited by the defendants in Florida. The article was published in a national magazine (National Enquirer) that had a large circulation in California. South, who wrote the first draft of the article, lived in Florida, and did most of his research in Florida, relying on phone calls to sources in California for the information contained in the article. Calder, the president and editor of the Enquirer, was also a resident of Florida. Calder reviewed South's draft and edited it in its final form. In finding that California had specific jurisdiction over South's and Calder's persons under these facts, the Calder court stated that California was "the focal point both of the story and of the harm suffered," and that jurisdiction over their persons was "proper in California based on the `effects' of their Florida conduct in California. [Citations.]" (Calder, supra, 465 U.S. at p. 789, 104 S.Ct. 1482.)
Addressing due process concerns, the Calder court stated: "The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has `certain minimum contacts ... such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." [Citation.]' [Citation.] In judging minimum contacts, a court properly focuses on `the relationship among the defendant, the forum, and the litigation.' [Citations.] The plaintiffs lack of `contacts' will not defeat otherwise proper jurisdiction, [citation], but they may be so manifold as to permit jurisdiction when it would not exist in their absence." (Calder, supra, 465 U.S. at p. 788, 104 S.Ct. 1482.)
Calder concluded that California courts had personal jurisdiction over the defendants in Florida because defendants'"intentional conduct in Florida [was] calculated to cause injury to respondent in California." (Calder, supra, 465 U.S. at p. 791, 104 S.Ct. 1482.)
In California, the state's long-arm statute authorizes California courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc, § 410.10.) In Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14 Cal.4th 434, 444-445, 58 Cal.Rptr.2d 899, 926 P.2d 1085 (Vons Companies, Inc.), the California Supreme Court stated that the assertion of personal jurisdiction by a California court over a nonresident defendant who has not been served with process within the state "comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate `"traditional notions of fair play and substantial justice."' [Citations.]" The requirement of minimum contacts is satisfied, subjecting the nonresident defendant to the specific jurisdiction of the forum, "if the defendant has purposefully availed himself or herself of forum benefits [citation], and the `controversy is related to or "arises out of" a defendant's contacts with the forum.' [Citations.]" (Id. at p. 446, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)
Citing Burger King Corp. v. Rudzewicz (1985) 471 U.S. 462, 105 S.Ct. 2174, 85 *914 L.Ed.2d 528, Vons Companies, Inc. explained that a forum state may exercise specific jurisdiction over a nonresident who purposefully avails himself or herself of forum benefits "because the state has `a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. [Citations.] Moreover, where individuals "purposely derive benefit" from their interstate activities [citation] it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities.' [Citation.] Further, `because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.' [Citation.]" (Vons Companies, Inc., supra, 14 Cal.4th at p. 447, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)
Vons Companies, Inc. added that "[a] claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction. Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate. The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts. That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum." (Vons Companies, Inc., supra, 14 Cal.4th at p. 452, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)
Earlier, in Cornelison v. Chaney (1976) 16 Cal.3d 143, 147-148, 127 Cal.Rptr. 352, 545 P.2d 264 (Cornelison), the court, describing the reach of California's long-arm statute, set the standard by which the goal of fairness may be served: "The general rule is that the forum state may not exercise jurisdiction over a nonresident unless his relationship to the state is such as to make the exercise of such jurisdiction reasonable. [Citation.] [¶] If a nonresident defendant's activities may be described as `extensive or wide-ranging' [citation] or `substantial ... continuous and systematic' [citation], there is a constitutionally sufficient relationship to warrant jurisdiction for all causes of action asserted against him. In such circumstances, it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum. [¶] If, however, the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him, then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action. In such a situation, the cause of action must arise out of an act done or transaction consummated in the forum, or defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. Thus, as the relationship of the defendant with the state seeking to exercise jurisdiction over him grows more tenuous, the scope of jurisdiction also retracts, and fairness is assured by limiting the circumstances under which the plaintiff can compel him to appear and defend. The crucial inquiry concerns the character of defendant's activity in the forum, whether the cause of action arises out of or has a substantial connection with that activity, and upon the balancing of the convenience of the parties and the interests *915 of the state in assuming jurisdiction. [Citations.]"
Here, Pavlovich, a computer engineering student, a technician in the computer and telecommunications industry, and the founder and president of a startup technology company, knew that California is commonly known as the center of the motion picture industry, and that the computer industry holds a commanding presence in the state. In his deposition, Pavlovich spoke of California's dominance in the motion picture industry, as follows:
"Q. ... Are you aware-do you have any understanding where the major motion pictures studios [sic] are located?
"A [by Pavlovich]. By `major' I'm just going to go out on a limb here in that you mean some of the larger motion picture producers or production companies.
"Q. That's correct. The sort of plaintiffs that were the plaintiffs in the matter that you were just an expert witness in.
"A. Okay. That makes a lot of sense. Yeah, they make a lot of movies in California, Hollywood, yeah.
"Q. Right. So what's your understanding of the term `Hollywood'?
"A. Hollywood is the big area in California where they make a lot of movies and a lot of movie stars live and whatnot.
"Q. Is it fair to say that Hollywood, California is the center of the motion picture industry?
"A. I wouldn't know. Whether or not like all their offices and buildings are there, I don't know specifically, but I guess the general common idea is that Hollywood is the area for that...."
As to California's dominance in the computer industry, Pavlovich testified in the same deposition, as follows:
"Q. Do you have any understanding of whether or not a significant number of hardware manufacturers are located in California?
"A [by Pavlovich]. I believe ... there is a lot of technology companies out in California .... Yeah, there's several hardware manufacturers located in California.
"Q. Have you ever heard of Silicon Valley?
"A. Yes.
"Q. What does that refer to?
"A. That's an area where there is a lot of technology-related companies, software writers, hardware manufacturers, programmers.
"Q. And that's in California; is that correct?
"A. Yes.
"Q. Based on your expertise in the computer industry, is there another state besides California that you could name has more or a higher concentration of hardware manufacturers?
"A. I don't know the exact numbers that are in the Silicon Valley. You know, I do know there is a lot now in Texas. We have got the Silicon Triangle is what we call it. There's three major cities in Texas with a lot of technology and telecommunications companies. Whether or notI don't know the numbers between the areas, but there is a lot of technology hot spots around the world.
"Q. What would you describe as the top three technology hot spots in the United States?
"A. Silicon Valley, Texas, andI have no idea where I'd get the third one from.
"Q. And as far asfor lack of a better term, hot spot of technology, is Silicon Valleyit's your understanding that Silicon Valley is such a hot spot of technology *916 with respect to hardware or software and programmers? Is that the things you identified before; is that correct?
"A. Yeah."
Because Pavlovich knew that California is commonly known as the center of the movie industry, and knew that Silicon Valley in California is one of the top three technology "hot spots" in the country, he knew, or should have known, that the DVD republishing and distribution activities he was illegally doing and allowing to be done through the use of his Web site, while benefiting him, were injuriously affecting the motion picture and computer industries in California. The question is whether Pavlovich's lack of physical and personal presence in California incapacitates California courts from jurisdictionally reaching him through its long-arm statute. We hold it does not.
Instant access provided by the Internet is the functional equivalent of personal presence of the person posting the material on the Web at the place from which the posted material is accessed and appropriated. It is as if the poster is instantaneously present in different places at the same time, and simultaneously delivering his material at those different places. In a sense, therefore, the reach of the Internet is also the reach of the extension of the poster's presence.
Long-arm statutes function in much the same way. They extend a state's jurisdiction to places beyond its boundaries to protect its laws from violations directed and perpetrated from afar. Thus, in Calder, it did not matter that the defendants, who lived in Florida, printed the newspaper in Florida and committed the violation of California's libel laws from that state.
So also here, the fact that Pavlovich used the new medium of the Internet to inflict harm on a California plaintiff, instead of the print media that was used in Calder, is irrelevant. It should not matter whether the delivery system used to inflict the injury is the traditional delivery system of air, land, or sea transportation, or the cutting-edge technological system of cyberspace, satellites, cable, and electromagnetic waves. California's long-arm statute looks at the effects, not at the system that delivered and produced those effects.
Pavlovich cannot claim innocent intent. As a computer engineering student, a technician in the computer and telecommunications industry, a founder and president of a technology start-up company, and a leader in the "open source" movement, Pavlovich knew, or should have known, that by posting the misappropriated information on the Internet, he was making the information available to a wide range of Internet users and consumers throughout the Internet world, including users and consumers in California.
Accordingly, there is sufficient showing of "purposeful availment" within the meaning of Vons Companies, Inc. and Cornelison. Indeed, it has been held that the "purposeful availment" requirement is satisfied where a defendant's intentional conduct causes harmful effects within the state. (Panavision Intern., L.P. v. Toeppen (9th Cir.1998) 141 F.3d 1316, 1321 (Panavision Intern., L.P.).)
Vons Companies, Inc. also discussed the parties' burdens in a motion to quash service of process on jurisdictional grounds. The court stated: "When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate *917 that the exercise of jurisdiction would be unreasonable. [Citation.] When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record. [Citation.]" (Vons Companies, Inc., supra, 14 Cal.4th at p. 449, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)
In Nissan Motor Co., Ltd. v. Nissan Computer Corp. (C.D.Cal.2000) 89 F.Supp.2d 1154, 1160-1161, it was held that "[a]n otherwise valid exercise of personal jurisdiction is presumed to be reasonable. [Citation.] Accordingly, once a court finds purposeful availment, it is the defendant's burden to `present a compelling case' that the exercise of jurisdiction would be unreasonable."
Here, Pavlovich has not shown that the exercise by the trial court of jurisdiction over his person would be unreasonable. Seven factors may be considered in determining whether jurisdiction over a nonresident defendant comports with notions of fair play and substantial justice under the due process clause. (Panavision Intern., L.P., supra, 141 F.3d at p. 1323; Core-Vent Corp. v. Nobel Industries AB (9th Cir.1993) 11 F.3d 1482, 1487-1488.) These factors are: "(1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiffs interest in convenient and effective relief; and (7) the existence of an alternative forum. [Citation.]" (Panavision Intern., L.P., supra, 141 F.3d at p. 1323.) "No one factor is dispositive; a court must balance all seven. [Citation.]" (Ibid.)
As to factor 1, Pavlovich knew that DVDs deliver motion picture content to their purchasers. Pavlovich also knew that the motion picture industry is centered in California, and that the computer and telecommunication industries have a substantial presence in California. Further; Pavlovich knew that his Web site allowed the illegal publishing and distribution of DVDs.
As to factor 2, it cannot be denied that defending the lawsuit in California is burdensome to Pavlovich. However, as observed in Panavision Intern., L.P.: "A defendant's burden in litigating in the forum is a factor in the assessment of reasonableness, but unless the `inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.' [Citations.] [¶] The burden on Toeppen as an individual living in Illinois to litigate in California is significant, but the inconvenience is not so great as to deprive him of due process. As the district court stated, `"in this era of fax machines and discount air travel" requiring Toeppen to litigate in California is not constitutionally unreasonable.' [Citations.]" (Panavision Intern., L.P., supra, 141 F.3d at p. 1323.)
As to factor 3, Pavlovich has not pointed to any conflict with the sovereignty of his home state.
Factors 4 through 6 clearly favor California, since they relate to the forum state's interest in adjudicating the dispute, the most efficient judicial resolution of the controversy, and the importance of the forum to the plaintiff's interest in convenient and effective relief.
*918 Factor 7, the existence of an alternative forum, also favors California because the claimed injury was, and is being, suffered in California, and, therefore, California has the greatest interest in the outcome of the litigation. Any alternative forum cannot claim a greater interest in this litigation.
Relying on Bancroft & Masters Inc. v. Augusta Nat. Inc. (9th Cir.2000) 223 F.3d 1082 (Bancroft), Pavlovich argues that California has no specific jurisdiction over him because he did not know the identity and location of the plaintiff when he undertook the alleged intentional acts, and did not aim those acts at that plaintiff, and thus there was no "express aiming" within the meaning of Colder. Pavlovich misreads Bancroft. Bancroft did not interpret the "express aiming" requirement of Calder to mean that the defendant must know the identity and location of the plaintiff when it undertakes the wrongful acts. Bancroft stated, merely that it understood the express aiming requirement of Calder to be "satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." (Bancroft, supra, 223 F.3d at p. 1087.) Bancroft did not say that targeting the wrongful conduct "at a plaintiff whom the defendant knows to be a resident of the forum state" is the only way to satisfy Calder's "express aiming" requirement. Indeed, Bancroft recognized that to meet the effects test of Calder, all that is required is that "the defendant must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." (Ibid., italics added.)
Neither does Calder's language suggest that the defendant must have known of the plaintiffs identity and location. Calder merely directs that "[i]n judging minimum contacts, a court properly focuses on `the relationship among the defendant, the forum, and the litigation.' [Citations.] The plaintiff's lack of `contacts' will not defeat otherwise proper jurisdiction, [citation], but they may be so manifold as to permit jurisdiction when it would not exist in their absence." (Calder, supra, 465 U.S. at p. 788, 104 S.Ct. 1482, italics added.) As the court keenly observed in Cassiar Mining Corp. v. Superior Court (1998) 66 Cal.App.4th 550, 557, 78 Cal.Rptr.2d 167, quoting Vons Companies, Inc., supra, 14 Cal.4th at pages 457-458, 58 Cal.Rptr.2d 899, 926 P.2d 1085: "`[T]he defendant's forum [related] activities need not be directed at the plaintiff in order to give rise to specific jurisdiction.... [T]he nexus required to establish specific jurisdiction is between the defendant, the forum, and the litigation [citations]not between the plaintiff and the defendant.'" (Some italics added and italics omitted.)
We conclude the denial by the trial court of Pavlovich's motion to quash service of process comports with notions of fair play and substantial justice under the due process clause of the United States Constitution. Consequently, the exercise of jurisdiction by the trial court is reasonable.

DISPOSITION
The petition for a writ of mandate is denied. Real party in interest DVD CCA is awarded costs as the prevailing party. The temporary stay order is vacated.
BAMATTRE-MANOUKIAN and WUNDERLICH, JJ., concur.